IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

NATCHEZ REGIONAL MEDICAL CENTER                                    PLAINTIFF

VERSUS                         CIVIL ACTION NO: 5:09-cv-207-DCB-JMR

QUORUM HEALTH RESOURCES, LLC,
JEFFREY S. WESSELMAN, AND MICHAEL
ANDERSON                                                          DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This cause is before the Court on Defendants' Motion for Summary Judgment [**docket entry no. 90**], Defendants' Motion to Exclude [**docket entry no. 93**], Plaintiff's Motion in Limine to Exclude Testimony of Expert Witness John Czarnetzky [**docket entry no. 94**], Plaintiff's Motion in Limine to Exclude Certain "Opinions" of Defense Expert J.W. Tillett, Jr., and to Strike Related Portions of Tillet's "Expert Report" [**docket entry no. 97**], Defendants' Motion in Limine [**docket entry no. 114**], and Plaintiff's Motion in Limine and to Exclude Witness Testimony [**docket entry no. 115**]. Having carefully considered these Motions, the substantial record in this case, applicable statutory and case law, and being otherwise fully advised in the premises, the Court finds and orders as follows:

## I. Overview and Procedural History

The present controversy arises out of the Defendants' alleged mismanagement of Natchez Regional Medical Center (NRMC). NRMC is a not-for-profit hospital owned by Adams County, Mississippi, and is established for the purpose of delivering quality healthcare to the

"Miss-Lou Region."[1] NRMC Bylaws at 3. As such, the Adams County Board of Supervisors appoints permanent residents of Adams County, Mississippi, to a seven-member Board of Trustees (Board) for a three-year term. Id. at 3-4. The Board's purpose is to oversee the hospital's maintenance, operation, and institutional planning. Id. Quorum Health Resources, LLC is a private company that specializes in providing management services to hospitals. Complaint ¶ 2. In order to provide these management services, Quorum installs "Key Personnel" into hospitals, including a CEO and CFO, to manage the hospital's daily affairs and assist the hospital in its short-term and long-term fiscal management. Defendant Jeffrey Wesselman acted as the CFO from September 2005 through April 2006, and then as the CEO from April 2006 to March 2008. Complaint ¶ 4. Defendant Michael Anderson was the CFO from April 2006 through February 2008. Complaint ¶ 3.

NRMC entered into its first management agreement with Quorum in 1992, and this agreement was renewed in 1999. The 1999 Management Agreement (hereinafter referred to as "the Agreement" or "Contract") was still in effect at the time the present dispute arose between the Parties, although they amended the Agreement three times. Pursuant to the Contract, Quorum was obliged to

---

[1] NRMC explains that the hospital's primary service area includes Adams, Franklin, Jefferson, and Wilkinson County Mississippi, as well as the Louisiana parish of Concordia-an area collectively known as the Miss-Lou Region. Complaint ¶ 7.

perform certain duties for NRMC, which, among other things, included staffing the hospital with "Key Personnel," submitting budgets to the Board, supervising accounting, charging for hospital services and receiving payments, and presenting management plans and financial reports. See, e.g., Management Agreement (1999) at 3-7, docket entry 90-3. The effect of the Agreement was that NRMC ceded to Quorum, or more specifically, its Key Personnel, control over the day-to-day operations of the hospital.

Sometime in 2008, the Board grew dissatisfied with Quorum and its Key Personnel's performance and terminated the Contract. The reasons for the Board's dissatisfaction are explained in greater detail below. Shortly thereafter, the Board replaced Quorum with another management company, Healthcare Management Partners, LLC (HMP), and with HMP's assistance allegedly discovered that Quorum and its representatives had been mismanaging the hospital as far back as 2001. On December 9, 2009, NRMC filed a fifty-three page Complaint in this Court, which has jurisdiction over the cause as the matter is between citizens of different states and well exceeds the Court's $75,000 jurisdictional threshold. NRMC brings nine separate causes of action, ranging from a run-of-the-mill breach of contract claim to a less-frequently alleged corporate waste claim.

On August 20, 2010, the Court denied the Defendants' Motion to Dismiss. They now move for summary judgment pursuant to Federal Rule of Civil Procedure 56. Because the case was originally

scheduled for July, the Parties have also filed their motions to exclude and motions in limine. In response to the Defendants' Motion to Exclude, the Court held a <u>Daubert</u> hearing on June 20, 2012, at the United States Courthouse in Natchez, Mississippi. <u>See</u> May 24, 2012 Order. At that time, pursuant to the Court's instruction, the Parties also engaged in oral argument as to the enforcability of the exculpatory clause contained in the three Amendments to the Agreement. <u>See</u> <u>id.</u> Considering all relevant matters fully briefed and argued, the Court will address the pending Summary Judgment Motion [docket entry no. 90] and the multiple Motions to Exclude [docket entry nos. 93, 94, 97] but will delay ruling on the remaining unresolved issues raised in the Motions in Limine [docket entry nos. 114, 115], as identified in the Stipulation and Consent Order [docket entry no. 126].

## II. Defendants' Motion for Summary Judgment

Summary judgment is apposite "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law. An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party." <u>Ginsberg 1985 Real Estate P'ship v. Cadle Co.</u>, 39 F.3d 528, 531 (5th Cir. 1994) (citations omitted). The party moving for summary judgment bears

4

the initial responsibility of apprising the district court of the basis for its motion and the parts of the record which indicate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

"Once the moving party presents the district court with a properly supported summary judgment motion, the burden shifts to the non-moving party to show that summary judgment is inappropriate." Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). But the nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Moreover, "[t]he mere existence of a scintilla of evidence is insufficient to defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 252. Summary judgment must be rendered when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

**1. Whether the Limitation of Liability Clause in the Management Agreement Bars NRMC from Recovering Most of the Damages It Seeks**

The Defendants first argue that the following limitation of liability clause, found in the First, Second, and Third Amendments

5

to the Management Agreement, precludes the majority of damages sought by NRMC:

> **Limitation of Liability for Quorum.** To the extent permitted by Mississippi law, Quorum, its employees (including, without limitation, the Key Personnel), agents, representatives and/or Affiliates shall have no liability to NRMC for any indirect, consequential, incidental, exemplary, special or punitive damages or costs including, without limitation, lost profits or loss of good will, even if such party has been advised, knew or should have known of the possibility thereof.

First Amendment to the Management Agreement ¶ 10.[2] Clauses which limit liability historically have been viewed with disfavor in Mississippi jurisprudence, but recently the Mississippi Supreme Court has expressed a willingness to validate such agreements based upon the now-dominant public policy that parties should be free to contract. Kroger Co. v. Chimneyville Props. Ltd., 784 F. Supp. 331, 349 (S.D. Miss. 1991) (citing Cappaert v. Junker, 413 So. 2d 378, 381 (Miss. 1982)).

The Mississippi Supreme Court has explained its view of limitations of liability clauses this way:

> The law does not look with favor on contracts intended to exculpate a party from the liability of his or her own negligence although, with some exceptions, they are enforceable. However, such agreements are subject to close judicial scrutiny and are not upheld unless the intention of the parties is expressed in clear and unmistakable language.

Turnbough v. Ladner, 754 So. 2d 467, 469 (Miss. 1999). "Clauses

---

[2] This clause is frequently referred to below as an exculpatory clause.

limiting liability are given rigid scrutiny by the courts, and will not be enforced unless the limitation is fairly and honestly negotiated and understandingly entered into." Id. (quoting Farragut v. Massey, 612 So. 2d 325, 330 (Miss. 1992)). Furthermore, even if the bargaining process withstands this "rigid scrutiny," the Mississippi Supreme Court has stated that a court must void an otherwise honestly negotiated exculpatory clause if it contravenes public policy. Cappaert, 413 So. 2d at 382. The standard for what constitutes a violation of public policy is not always clear; thus invalidating a clause as a violation of public policy is a judicial power easily abused and should be done with an abundance of caution. Id. at 381 (citing State ex rel. Knox v. Edward Hines Lumber Co., 115 So. 598, 605 (Miss. 1928)).

> *A. Whether the Limitation of Liability Clause Incorporated Into the Management Agreement Was Fairly and Honestly Negotiated and Understandingly Entered Into*

 The Defendants argue that all evidence indicates the clause was fairly and honestly negotiated by two parties of equal bargaining power. NRMC contends that the clause could not have been fairly and honestly negotiated because Quorum was well aware of its legal opinion that the clause violated public policy. It is undisputed that, before the limitation of liability clause was signed, NRMC's attorney researched the enforcability of exculpatory clauses under Mississippi law and, relying on various opinions from the Office of the Mississippi Attorney General (AG Opinions),

informed both NRMC and Quorum of his legal conclusion that the clause was unenforceable in Mississippi. NRMC consented to the inclusion of the clause only upon the condition that Quorum incorporated the introductory phrase "to the extent permitted by Mississippi law" into its boilerplate language. The phrase "to the extent permitted by Mississippi law" was presumably taken from one of two AG Opinions. In the latest Opinion on the subject, the Mississippi Attorney General states:

> With regard to your fourth question, this office has previously opined that the addition of the phrase "to the extent permitted by Mississippi law" to indemnity and hold harmless clauses is not prohibited but, in our opinion, has no legal effect on the State's liability or lack thereof. Such language may serve to notify the contractor or vendor of the State's lack of authority and may thereby help insulate from personal liability the state employee or official signing the agreement.

MS AG Op., Stringer, Jr., (Jan. 25, 2006), 2006 WL 1900660 (citation omitted). Without specifically saying so, NRMC implies that including the phrase "to the extent permitted by Mississippi law" notified Quorum of its "lack of authority" and "insulate[d] [it] from personal liability" Id.

In Turnbough v. Ladner, a scuba diver signed a waiver of his right to bring a negligence cause of action against his scuba instructor as a condition precedent to his enrollment in diving certification classes. He signed the agreement despite the fact that, shortly beforehand, he was informed by a classmate-attorney that the waiver was unenforceable under Mississippi law. 754 So. 2d

8

467, 468 (Miss. 1999). Subsequently, following a dive, the diver got the bends and brought suit against his instructor, who convinced the circuit court that the waiver barred the diver's negligence claims. Id. at 468. The Mississippi Supreme Court, however, reversed on grounds that the clause was not fairly and honestly negotiated. Id. at 470. Notably absent from the supreme court's analysis was the fact that the scuba-diver had been informed of the clause's unenforcability but signed it anyway.[3]

As in Turnbough, this Court finds the Parties' understanding of the law irrelevant to its analysis of whether the clause was fairly and honestly negotiated. The evidence suggests that the Parties did indeed disagree as to the state of the law governing limitations of liability clauses in Mississippi, but this same evidence indicates that both Parties fully discussed their different legal positions. In other words, it appears that the Parties failed to reach a mutual understanding with regard to the law but did arrive at a mutual understanding as to how the limitation of liability clause would be included in the contract in such a way to satisfy their concerns. What matters to this Court is that the Parties, who were on equal footing during the bargaining process, understood the effect of including the agreement and

---

[3] Interestingly, then-Justice Mills argued that the diver's belief that the clause was unenforceable should be held against him because he signed it with the intention not to honor it. See id. at 471 (Mills, J., dissenting). Quorum, citing the dissent in Turnbough, took a similar position at the June 20 hearing.

voluntarily chose to enter into the agreement after negotiating what each considered acceptable language. The core question is how, if at all, does Mississippi public policy factor into this situation.

### B. Whether the Clause Violates Public Policy

NRMC's primary challenge to the limitation of liability clause is founded in the various AG Opinions, each of which respond to inquiries regarding the propriety of a public entity executing a liability limitation clause in a contract with a private party. See MS AG Op., Stringer, Jr., (Jan. 25, 2006), 2006 WL 1900660; MS AG Op., Thomas (Dec. 2, 2003), 2003 WL 22970528; MS AG Op., Chamberlin, (Oct. 18, 2002), 2002 WL 31663333; MS AG Op., Griffith, (May 28, 1999), 1999 WL 535496; MS AG Op., Davis, (Mar. 3, 1993), 1993 WL 669150; MS AG Op., Morse Jr., (Aug. 3, 1981), 1981 WL 39498. Each AG Opinion takes the unequivocal position that a Mississippi public entity cannot execute a clause which purports to limit a private party's liability to the state, its agents, or municipalities. The AG Opinions, however, are not binding on this Court, Freelance Entm't, LLC v. Sanders, 280 F. Supp. 2d 533, 546 (N.D. Miss. 2003), and a close examination of these Opinions reveals, if anything, a lack of binding legal authority directly on point. In fact, the most persuasive authority cited in the Opinions is a statute *authorizing* the executive director of the Mississippi Department of Information Technology Services to agree to

limitation of liability provisions when negotiating contracts for the state. See Stringer Op., 2006 WL 1900660 (citing Miss. Code. Ann. § 25-53-21(e)). But even this statute offers little guidance in the present situation, other than to suggest, as Quorum argued at the hearing, that an exculpatory clause entered into by the state or its agencies does not violate public policy per se.

The Mississippi Supreme Court and the Mississippi Court of Appeals have addressed the enforcability of exculpatory clauses in a variety of contexts; however, in these cases, only one of the contracting parties was a public entity, and only a handful were invalidated explicitly for public policy reasons. See Turnbough, 754 So. 2d 467 (invalidating an agreement whereby a diving student waived his right to recover for harms occurring during diving class); Quinn v. Miss. State Univ., 720 So. 2d 843 (Miss. 1998), overruled on other grounds by, City of Jackson v. Estate of Stewart ex rel. Womack, 908 So. 2d 703 (Miss. 2005) (reversing the blanket enforcement of a general waiver of liability for physical injury incurred at a baseball camp); Cappert, 413 So. 2d 378 (voiding a clause relieving a landlord from his common law duty to maintain the common areas on the leased premises); Smith v. Smith, 375 So. 2d 1041, 1042 (Miss. 1979) (validating a commercial lease agreement exonerating a property holder of liability for personal or property damage occurring on the leased property); Rigby v. Sugar's Fitness & Activity Ctr., 803 So. 2d 497 (Miss. App. Ct. 2002), overruled on

11

other grounds by, City of Jackson v. Estate of Stewart ex rel. Womack, 908 So. 2d 703 (Miss. 2005) (finding no evidence that a waiver releasing the defendant from liability was fairly negotiated); Chimneyville Props. Ltd., 784 F. Supp. 331 (upholding an exculpatory clause in a commercial lease agreement). "When state law provides no definitive answers to the question presented, [the district court] must make an educated Erie guess as to how the Mississippi Supreme Court would resolve the issue. . . . [The district court] may consult a variety of sources, including the general rule on the issue, decisions from other jurisdictions, and general policy concerns." Travelers Cas. & Sur. Co. of America v. Ernst & Young, 542 F.3d 475, 483 (5th Cir. 2008) (internal citations and quotation marks omitted).

If a general rule can be extracted from the above cases, it is this one: an exculpatory contract should not be invalidated on public policy grounds unless the clause "is prohibited by the Constitution, a statute, or condemned by some decision of the courts construing the subject matter." Cappaert, 413 So. 2d at 381 (citing Edward Hines Lumber Co., 115 So. at 598).[4] When asked to

---

[4]    The rationale for this rule is expressed in Illinois Central Railroad Co. v. Harris: "If this contract is valid and binding on the employés of railroads, it will have the effect of repealing some of the statutes of this state. It will nullify the so-called comparative negligence section of our Code, so far as railroad employés are concerned." 67 So. 54, 56 (Miss. 1914) (invalidating a contract wherein the employees of a railroad company agreed to assume all risks incident to service).

invalidate a limitation of liability clause in conflict with a "decision of the courts construing the subject matter," the Mississippi Supreme Court has focused specifically on how the public, which is protected by a host of judicially-imposed common-law legal duties but is not a "party" to the contract, would be impacted by one private party's attempt to limit its liability to another private party. See Cappaert, 413 So. 2d at 381. Put another way, the Mississippi Supreme Court has analyzed whether the exculpatory agreement ensures that one of the contracting parties shoulders the legal duty imposed by common law and, relatedly, the degree to which the public could be harmed if the contract has the effect of exonerating both parties of this duty.

For instance, in Cappert v. Junker the Mississippi Supreme Court was asked to void a hold-harmless provision in a residential lease on the grounds that it violated public policy. Id. at 378-79. The supreme court focused less on the fact that the lease immunized the landlord from liability to the lessee and more on the fact that the lease had the unwelcome consequence of exonerating the landlord from his common-law duty to maintain the common areas on the leased premises. The supreme court chose to invalidate the clause because it "contravene[d] long established common law rules of tort liability that exist in the landlord-tenant relationship." Id. at 382. In reaching this conclusion, the supreme court, quoting at length the Washington Supreme Court, explained,

13

> [I]t cannot be said that such exculpatory clauses are "purely a private affair" or that they are "not a matter of public interest." The real question is whether we should sanction a technique of immunizing lessors of residential units within a multi-family dwelling complex, from liability for personal injuries sustained by a tenant, which injuries result from the lessor's own negligence in maintaining the "common areas"; particularly when the technique employed destroys the concept of negligence and the standard of affirmative duty imposed upon the landlord for protection of the tenant.

Id. at 381-82 (quoting McCutcheon v. United Homes Corp., 486 P.2d 1093, 1097 (Wash. 1971)). In other words, the supreme court looked beyond the rights of the parties vis-a-vis the clause to examine how "sanctioning" the exculpatory clause would nullify the typical duties of a landlord and thus have the potential to injure other members of the unsuspecting public.

In Kroger Co. v. Chimneyville Properties, LTD, a federal district court used the same basic logic to arrive at the opposite conclusion. In that case, the district court was asked to enforce a limitation of liability clause pertaining to a commercial lease agreement. The clause, rather than exonerating both parties of liability, shifted the lessor's common-law liability for damages to persons and property on the leased premises to the lessee. 784 F. Supp. at 349. Because the clause transferred the liability to the commercial lessee, the lessee had every reason to ensure the safety of the premises, whereas in Cappaert the duty to maintain the common area fell to no one. Id. Moreover, the contract expressly required the lessee to carry insurance, eliminating the possibility

14

that any injured party might go uncompensated. Id. For these reasons, the district court distinguished Cappaert, concluding that the clause did not impugn the public policy undergirding common-law rules of tort liability and invoked mere private concerns, which the parties had the right to bargain away in a contract. Id.

The difficulty this Court faces is how to apply this relatively straightforward analysis to a situation where public interest is implicated whenever a public agency executes an exculpatory clause, inasmuch as a public agency acts on the public's behalf. The AG's Office suggests that *all* exculpatory contracts entered into by the state, its agents, or municipalities are unenforceable as a matter of law because public interest is always affected.[5] The Court in its Erie-analysis, however, declines to adopt such a broad holding, which, in any case, appears to be in doubt in light of Miss. Code. Ann. § 25-53-21(e). Moreover, the Court recognizes, at least in principle, that there are potential benefits to the public in a public agency's execution of an exculpatory clause: the community (1) may receive an immediate financial discount or (2) be able to procure certain services that would otherwise not be available to it without some advance

---

[5] The AG Opinions do not explicitly state this conclusion, but it is the only conclusion the Court can draw from reading the Opinions. The logic therein, at least with respect to limitation of liability for negligent acts, appears to be little more than: the public's interest is always implicated therefore the clauses are unenforceable as a matter of law.

agreement limiting liability.[6] The narrower and more appropriate question to ask is whether the clause *sub judice* should be voided as a matter of public policy.

The Mississippi Supreme Court has held that the provision of healthcare services to any given community is an important governmental function. City of Leland v. Leach, 86 So. 2d 363, 364 (Miss. 1956) ("[D]uties connected with the preservation of the peace or health, or the prevention of the destruction of property by fire are all governmental duties, without question."). As such, in Ferguson v. Watkins the Mississippi Supreme Court concluded in the context of a libel suit that when a hospital is built with public monies and operates with public funds "the operation of [that] hospital is a matter of legitimate public interest." 448 So. 2d 271, 279 (1984). To be specific, in Ferguson the supreme court found that the county hospital's decision not to renew the contract of the hospital administrator was a matter of legitimate public concern. Id.

Despite this precedent, the Defendants suggest that the Management Agreement merely implicates private interests, characterizing the Agreement as involving the routine concerns of

---

[6] These benefits are raised by those seeking an official opinion from the Mississippi Attorney General in their inquiries about the propriety of executing exculpatory clauses. See, e.g., Thomas Opinion, 2003 WL 22970528 ("It is unlikely that we will be able to find another vender who can provide the same quality of service in a timely manner . . . .").

two sophisticated business partners. This characterization, however, paints an incomplete picture. On a fundamental level, the duties imposed on Quorum by the Management Agreement are inextricably linked to NRMC's ability to carry out its important governmental function–the provision of quality healthcare services to the local community–and by virtue of that Agreement Quorum's execution of those duties is clearly a matter of public concern. The Management Agreement spells out Quorum's role in carrying out NRMC's mission: "Quorum shall use all reasonable efforts to implement the Board of Trustees's policies and directives with the goal of causing the Hospital to provide quality healthcare consistent with the polices and directives dictated by the Board of Trustees . . . ." Management Agreement (1999) at § 3.

To that end, Quorum and its Key Personnel were contractually obligated to perform functions essential to NRMC's success, including presentation of the yearly budget, management of accounting, billing, and payments, and administration of hospital policies in hiring and firing employees. Id. Although the Contract makes clear that the Board was responsible for NRMC's policies and ultimately its financial state, the effect of the contract was that the Board ceded the day-to-day operation of the hospital to Quorum and its Key Personnel, and therefore NRMC was entirely dependant upon Quorum and its Key Personnel in order to fulfill its duties as outlined in the Agreement. For example, Quorums's appointed CEO and

CFO were responsible for presenting yearly budgets to the Board. Thus, the Board's ability to make prudent financial decisions was in large part dependant upon the duty of the CEO and CFO to timely and accurately execute their responsibilities.

In absolving any CEO or CFO of civil liability for their negligent or intentional acts, there is the obvious danger of fiscal irresponsibility. At the hearing, NRMC's expert, Scott Phillips, stated that under the Defendants' direction NRMC executed a bond which it did not have the finances or financial outlook to support, putting the taxpayers on the hook for a very bad investment. See also, Phillips Report at 35-37. But the attendant harm caused by fiscal waste in this context is not primarily to the public coffers. The public, of course, has a significant interest in the hospital's prudent administration of tax dollars, but in the context of the preservation of health, the public harm stems from the possible elimination of needed healthcare services should the hospital be forced to close its doors because of a lack of resources or, perhaps worse, the provision of substandard healthcare services under a poorly funded hospital. It is not difficult to imagine the ills to befall the community should it be unable to access quality healthcare.

Relatedly, in addition to any pecuniary interest, the taxpayers have an interest in a well-managed public hospital. See Ferguson, 448 So. 2d at 279 n.8 ("[T]he public *ought to care*

because their tax dollars are being used to fund the operation of the hospital." (emphasis in original)). NRMC and its expert Scott Phillips describe the Quorum-managed hospital as being in a substandard and deteriorating condition. In his report, he claims that:

a. The roof of the main patient tower leaked so badly that the hallway of the patient unit on the fifth or top floor had to be lined with garbage cans each time it rained to catch the water coming through the roof.

b. The main parking lot was badly damaged and was not safe for a patient or visitor using a walker to cross.

c. The exterior brick and stucco had not been regularly resealed resulting in a catastrophic situation for the entire community when Hurricane Gustave blew rainwater through the exterior walls of the surgical suites forcing the emergency shutdown of surgical services for three weeks. NRMC operates 60% of the total number of hospital operating rooms in Natchez, MS . . . .

d. Patient furnishings in the routine medical surgical units had not been replaced since the Hospital had opened. Many of the mattresses upon which the patients lay were no longer serviceable and contained large holes that were covered with duct tape in an effort to keep out body fluids.

e. Half of the patients rooms on the fifth floor were closed because they did not have a functioning nurse call system as required by licensure and accreditation guidelines.

f. Many patient rooms were not serviceable because they did not have functioning air conditioning units.

g. In spite of being heavily overstaffed in the housekeeping department, the carpeting in the hallways on the medical surgical units was so worn, stained and crusted with dirt that four large strips the pattern [sic] in the carpeting was no longer visible.

h. There was no evidence that the floors and wall

> surfaces in the patient rooms had been regularly
> maintained.

Phillips Report at 8-9. It is, of course, for the fact-finder to decide whether these factual allegations are true and whether the Defendants' alleged mismanagement actually played a role in these events. For the purposes of policy determination, what is important is the principle, and in principle, the Court can imagine other hypothetical scenarios, not unlike the factual allegations in the present case, that counsel against sanctioning exculpatory clauses which involve "duties connected with the preservation of the peace or health." City of Leland, 86 So. 2d at 364; see also Cappaert, 413 So. 2d at 381-82.

If the Court were to validate the present agreement, it would sanction a clause that disincentivizes the care with which a CEO prepares the public hospital's financial statements or the care with which a CEO oversees a public hospital's medical staff, facilities, and equipment. Allowing the Defendants to be absolved of their various legal duties connected with the preservation of peace or public health shifts a serious and unacceptable risk of harm to the public. This sort of risk-shifting is condemned by the courts of Mississippi, and therefore the Court finds that the present exculpatory clause in the Management Agreement is unenforceable as a matter of Mississippi law.

*C. Scope of the Limitation of Liability Clause*

Morever, even if the Court finds that the agreement is

enforceable as a matter of law, the Court notes, for the record, that it is yet to be determined whether the majority of damages NRMC seeks fall within the scope of the limitation of liability clause. The clause purports to limit NRMC's ability to recover "indirect, consequential, incidental, exemplary, special or punitive damages." Notably, direct damages are not named in the exclusion. In its brief, NRMC argues that at least a portion of the "lost profits" it seeks in connection with its claims are direct damages. See Pl.'s Memo. in Opp'n to Summ. J. at 106 (citing cases). The Parties have not fully briefed this issue, but at the hearing the Defendants clearly articulated their contrary position which is that the only damages recoverable as direct damages are the fees NRMC paid to Quorum under the Agreement.

Also, the Court is skeptical of any attempted waiver of punitive damages inasmuch as such damages are directly linked to conduct surpassing ordinary negligence. Miss. Code Ann. § 11-1-65(1)(a) (establishing that punitive damages are only recoverable if a plaintiff can demonstrate actual malice, gross negligence, or actual fraud). Restatement (Second) of Contracts § 195, an authority that has proven persuasive to the Mississippi Supreme Court in the past, states: "A term exempting a party from tort liability for harm caused intentionally or recklessly is

unenforceable on grounds of public policy."[7] In the present case, the exclusion of punitive damages has the unquestionable effect of limiting, but not necessarily totally exempting, Quorum's liability to NRMC for any actions committed with actual malice, gross negligence, or fraudulent intent and thus could be interpreted as contrary to public policy. Had the Court validated the limitation of liability clause, the separate issue of whether punitive damages can be waived would be an issue in this case, as NRMC seeks punitive damages related to some of its claims. Complaint at 51-52; see also, Hurst v. Sw. Miss. Legal Servs. Corp., 708 So. 2d 1347, 1350 (Miss. 1998) (stating that punitive damages in a breach of contract action "are recoverable where the breach results from an intentional wrong, insult, or abuse as well as from such gross negligence as constitutes an independent tort.").

**2. Whether NRMC's Claims Arising Out of Conduct Occurring Before February 12, 2006 Have Been Waived and/or Barred by the Statute of Limitations**

Next, the Defendants ask the Court to limit NRMC's ability to recover damages to the events occurring after February 12, 2006.[8]

---

[7] This is the authority for the A.G. Office's opinion that clauses which purport to limit liability for intentional or reckless conduct are void as a matter of public policy. See Davis Op., 1993 WL 669150.

[8] The Defendants rightly indicate that February 12, 2006, is the date before which the claims would be barred, since NRMC filed bankruptcy on February 12, 2009, which tolled the limitations period. Young v. United States, 535 U.S. 43 (2002). NRMC filed suit in December 2009.

They offer three reasons in support. First, they claim that the Complaint is focused on events occurring just prior to September 30, 2006, and therefore any damages related to events occurring before that time are not recoverable. Secondly, they argue each of NRMC's claims are subject to a three-year statute of limitations and are therefore barred. Finally, they suggest that NRMC waived the right to bring a cause of action related to Quorum's pre-2005 conduct because the Board knew of the hospital's deteriorating financial condition but chose not to terminate the Management Agreement. The Court will address these arguments in turn.

*A. Whether the Complaint Asserts Facts Sufficient to Recover the Damages Outlined in the Report of Scott K. Phillips*

In support of its damages claim, NRMC produced a report from its expert Scott Phillips, wherein he opines that NRMC incurred damages as far back as the fiscal year beginning October 1, 2001. The Defendants argue that the Complaint focuses almost exclusively on events occurring between 2006 and 2007–the period during which Defendants Wessleman and Anderson were actively running the hospital. NRMC retorts that, under the federal notice-pleading standard, it pled sufficient facts to allow the recovery of damages outlined in Phillips's report.

Federal Rule of Civil Procedure 8 does not require the plaintiff to "plead in his complaint every date, person, event and other fact that must be proved to obtain a favorable judgment." Williams v. Louisiana State Univ. Health Sci., 2012 WL 444006, at

*1 (W.D. La. Jan. 12, 2012). Instead, it "requires only a short and plain statement of the claim showing that the pleader is entitled to relief. Specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." See Erickson v. Pardus, 551 U.S. 89, 93 (2007) (internal quotations marks and citations omitted). While the majority of the allegations in the Complaint do center around events occurring in 2006 and 2007, the facts pled thereto often refer specifically to pre-2006 conduct. For example, the Complaint alleges that in 2005 Quorum's off-site review of NRMC's fiscal state revealed its on-site management failed to appropriately monitor stale managed-care contracts. Complaint ¶ 77. The Complaint further alleges that the hospital was overstaffed as early as 2003 and claims that it was under-billing as early as 2001. Id. ¶ 80. The Court finds that these facts are sufficient to give the Defendants fair notice that the damages NRMC seeks are not limited strictly to events occurring after 2006.

   *B. Whether Any of NRMC's Claims Are Subject to Mississippi's Three-Year Statute of Limitations*

   Next, the Defendants maintain that the damages recoverable for each of the counts listed in the Complaint are limited by Mississippi's three-year general statute of limitations. See Miss. Code Ann. § 15-1-49; see also Rankin v. Am. Gen. Fin., Inc., 912 So. 2d 725, 726 (Miss. 2005) (holding that claims for breach of fiduciary duty, breach of implied covenant of good faith and fair

dealing, negligent misrepresentation, fraudulent misrepresentation, and negligence are subject to Miss. Code Ann. § 15-1-49); CitiFinancial Mortg. Co., Inc. v. Washington, 967 So. 2d 16, 19 (Miss. 2007) (finding the plaintiff's breach of contract claim subject to the three-year statute of limitations). In support of this argument, the Defendants acknowledge, in a lengthy footnote, that this Court has once rejected the notion that the statute of limitations can run against any subdivision or municipal corporation of the State of Mississippi, see Aug. 20, 2010 Order; therefore, they refashion their earlier position into a relatively novel constitutional argument.

The Defendants argue that the Mississippi Supreme Court in University of Mississippi Medical Center v. Robinson held that a defendant has a vested right in a statute of limitations bar once the statutory time period has run in its favor. 876 So. 2d 337 (Miss. 2004). While that is the holding in Robinson, the Court finds no merit in the assertion that *the Defendants* have a vested right in a statute of limitations defense. As stated in the August 20, 2010 Order, Section 104 of Article 4 of the Mississippi Constitution expressly states that "statutes of limitations in civil causes *shall not run* against the state, or any subdivision or municipal corporation thereof." (emphasis added); see also, Miss. Code. Ann. 15-1-51 (codifying this protection). It is undisputed

that municipal hospitals, like NRMC, fall within this protection.[9]
Parish v. Frazier, 195 F. 3d 761, 764 (5th Cir. 1999); Enroth v.
Memorial Hosp. at Gulfport, 566 So. 2d 202, 206 (Miss. 1990). By
the express language of the Mississippi Constitution, no right
vested or could vest in the Defendants because the statute did not
run and could not run in their favor.[10] Therefore, the Court
declines the Defendants' invitation to declare Miss. Code Ann. §
15-1-49 unconstitutional because it deprives them of a vested right
without due process of law and elects not to certify this issue to
the Fifth Circuit, as the Defendants request in a footnote. The
Court finds that Mississippi's three-year statute of limitations
cannot run against NRMC and therefore does not limit NRMC's actions
occurring before February 12, 2006.

Moreover, even if statutes of limitation could run against
NRMC, the Defendants would not be entitled to summary judgment on
this issue. Mississippi has adopted the discovery rule, which
provides that the statutes of limitation begin to run only when the
plaintiff discovers or should have discovered the alleged

---

[9] To the extent that the Defendants argue that NRMC is not
entitled to the protections of Miss. Code. Ann. 15-1-51 because it
is engaged in a proprietary as opposed to governmental function, as
discussed above, the Mississippi Supreme Court has unequivocally
held that providing for the public's health is an important
governmental function.

[10] The Defendants' attempt to distinguish their argument from
the one presented in Murphree v. Aberdeen-Monroe Cnty. Hosp., 671
So. 2d 1300 (Miss. 1996) based on their strained interpretation of
Robinson is unconvincing.

misconduct. <u>Donald v. Amoco Production Co.</u>, 735 So. 2d 161, 166 (Miss. 1999). The fact that NRMC was aware of its precarious fiscal state does not, as the Defendants argue, indicate that NRMC was aware of any misconduct. The statute of limitation would begin to run, if it could run, only when NRMC discovered or should have discovered that the Defendants purportedly caused their financial decline. There is a significant dispute in the record as to when such knowledge was or should have been gained, and therefore a disputed issue of material fact appropriate for presentation to the fact-finder. To be clear, however, this is not an issue at trial because the Court finds that the statute of limitations defense is inapplicable in the present suit.

*C. Whether NRMC Waived Its Right to Bring Any Cause of Action Arising Out of Events Occurring Before 2005*

Finally, with respect to their waiver-and/or-barred arguments, the Defendants assert that NRMC waived any cause of action it might have had against them by renewing the Management Agreement each year between 2002-2005 because NRMC knew that the hospital's financial condition was slowly deteriorating. Specifically, on January 17, 2006, an independent auditor prepared and issued to the Board an Audit Report/Financial Statement for Fiscal Year 2005, which indicated that NRMC incurred net losses of over $5.3 million between 2001 and 2005. Shortly after receiving this information, the Board inquired about the advantages and disadvantages of filing bankruptcy but chose to carry on "business as usual" with Quorum.

27

The Defendants argue that the Board's decision to continue to do business with Quorum constituted a waiver of any claims it may have had arising out of this time period. NRMC counters that it did not intentionally waive any claims because it did not and could not have known about the Defendants' misconduct.

Under Mississippi law, "to establish waiver, a movant must show an act or omission which evidences an intentional and voluntary surrender of a right." Hauer v. Am. Pub. Life Ins. Co., 2007 WL 892447, at *3 (S.D. Miss. Mar. 21, 2007) (citing Brent Towing Co., Inc. v. Scott Petroleum Corp., 735 So. 2d 355, 359-60 (Miss. 1999)). Similar to the analysis above regarding the discovery rule, the Court finds that there is not enough evidence to suggest that NRMC was aware or should have been aware that the Defendants committed any misconduct. There is no question that NRMC's Board was well aware that the hospital was financially backsliding. It does not follow, however, that NRMC's Board knew or should have known that the Defendants, as they allege in the Complaint, caused this decline, especially since NRMC avers that the Defendants often represented to the Board that the hospital's financial state was a consequence of factors outside of their control. The Court cannot conclude that the evidence in this record clearly demonstrates an "intentional and voluntary surrender of a right," and therefore finds that summary judgment is not warranted as to this argument. See Brent, 735 So. 2d at 359-60.

**3. Whether the Defendants Owed a Fiduciary Duty to NRMC (Count One of the Complaint)**

Next, the Defendants contend that they owe no fiduciary duty to NRMC and thus are entitled to summary judgment on this claim. The Court previously rejected this argument, which was raised in their Motion to Dismiss. See Aug. 20, 2010 Order at 10-12. Now, the Defendants maintain that additional facts uncovered during the course of discovery should alter the Court's earlier conclusion. NRMC challenges this characterization, pointing out that the Defendants do not present any new evidence in support of their claim and do little more than rehash the arguments this Court has already repudiated. This Court agrees with NRMC. Not only did the Defendants not present any new evidence in support of this claim, they present *no* evidence, relying entirely on their interpretation of the Management Agreement. For this reason, the Court need not review the relevant case law or rearticluate the reasons why a fiduciary duty exists, which can be found in the August 20, 2010 Order.

Briefly addressing the Defendants' new argument, the Court recognizes that the Board maintained important authority and control over NRMC's operations. Even so, Wesselman and Anderson, as the CFO and CEO of NRMC, simply by virtue of their positions also maintained a significant level of control over NRMC. See, e.g., Derouen v. Murray, 604 So. 2d 1086, 1092 (Miss. 1992). This fact, taken together with the other three factors which unquestionably

weigh in favor of finding that a fiduciary relationship existed, compel this Court to conclude that a fiduciary relationship between NRMC and the Defendants did in fact exist. See Booker v. Am. Gen. Life and Accident Ins. Co., 257 F. Supp. 2d 850, 860 (S.D. Miss. 2003) (citing Univ. Nursing Assocs., PLLC v. Phillips, 842 So. 2d 1270, 1274 (Miss. 2003)).[11]

## 4. Whether There is a Genuine Issue of Fact to Support NRMC's Claims of Fraud and Negligent Misrepresentation (Counts Five and Six of the Complaint)

The Defendants maintain that the claims of fraud and negligent misrepresentation hinge on allegations in the Complaint arising out of the Defendants' alleged misrepresentations to the Board between September 2006 and February 2008. As to the fraud claim, the Defendants argue that NRMC cannot show by clear and convincing evidence that they (1) knew the financial statements provided to the Board during that period were false, (2) intended to mislead the Board with the alleged misrepresentations, and (3) induced the Board to rely on the misstatements. See Levens v. Campbell, 733 So.

---

[11] To the extent that the Defendants maintain that Quorum had a lesser degree of control than Wesselman and Anderson over hospital operations and therefore did not have a fiduciary relationship with NRMC, the Court notes that the other three factors indicate a fiduciary relationship. Quorum acted for its own benefit and for the benefit of the hospital; it shared a common interest with NRMC and profited from the hospital's success; and NRMC and Quorum reposed trust in one another. Robley v. Blue Cross/Blue Shield of Miss., 935 So. 2d 990, 995 (Miss. 2006). Moreover, Quorum agreed to act as NRMC's agent, which also established fiduciary duties. See Van Zandt v. Van Zandt, 86 So. 2d 466, 469 (Miss. 1956).

2d 753, 761-62 (Miss. 1999) (listing all nine elements of a fraud claim). With respect to the negligent misrepresentation claim, the Defendants contend that NRMC cannot show reliance on any of the alleged negligent misrepresentations, and even if they could, they cannot be liable for any misrepresentations that should have been obvious to or known by NRMC. <u>Travelers Cas. & Sur. Co. of America</u>, 542 F.3d at 483. NRMC responds that there is direct evidence to contradict the Defendants' assertion that the Board did not rely on the Defendants' misstatements and circumstantial evidence to indicate that the Defendants were aware of the falsity of their statements and intended to mislead the Board.

As an initial matter, the Court agrees with NRMC that there is enough evidence in the record to at least create a genuine issue of material fact as to whether the Board relied on statements produced by the Defendants. <u>See, e.g</u>, Godfrey Depo. at 22; Bland Depo. at 63; Ernst Depo. at 39, 52, 68. The fact that some members of the Board maintained doubts as to the accuracy of the financial information provided, or distrusted Anderson, does not mean that they knew or should have known of any alleged misrepresentations. <u>See</u> Bland Depo. at 202; Ernst Depo. at 40. The Court, at this point, cannot tell from the record if any of the Board members were aware of any specific misrepresentations made by the Defendants. Accordingly, the Court denies the Defendants' Motion with respect to NRMC's negligent misrepresentation claim.

The more difficult question is whether there is circumstantial evidence in the record indicating that the Defendants were aware of the falsity of the statements and intended to mislead the Board with such representations. NRMC avers that both direct and circumstantial evidence exist, yet NRMC chooses not to identify where any of this direct or circumstantial evidence can be found in the record. The Court, however, having recently heard the live testimony of Scott Phillips during the June 20 <u>Daubert</u> hearing, is aware that he is of the opinion that Quorum knew of and intentionally overstated the reported value of net patient accounts receivable on the balance sheet. <u>See</u> Phillips Report at 43-46. He reached this conclusion based on the lack of any evidence to substantiate the reported value of self-pay patient accounts. <u>See</u> <u>id.</u> Questions of intent are always difficult to decipher, and where some circumstantial evidence exists to support a claim, summary judgment is improper. <u>Jones v. Borden Co.</u>, 430 F.2d 568, 574 (5th Cir. 1970). Accordingly, the Court will deny the Defendants summary judgment on NRMC's fraud claim.

**5. Whether Quorum is Entitled to Summary Judgment as to NRMC's Aiding and Abetting Claim (Count Seven of the Complaint)**

Count Seven of the Complaint alleges that Quorum should be liable for aiding and abetting Anderson's and Wesselman's alleged breach of fiduciary duties. The Defendants contend that, to the extent that Mississippi recognizes the independent tort of aiding and abetting, the claim is not proper against Quorum because

32

Anderson and Wesselman were its employees and thus it cannot aid and abet itself.[12] See Gallagher Bassett Servs., Inc. v. Jeffcoat, 887 So. 2d 777, 786 (Miss. 2004) ("Under Mississippi law, [a] conspiracy is a *combination of persons* for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." (emphasis added) (internal quotation marks and citations omitted)). NRMC counters that the Defendants' civil-conspiracy argument is a misapplication of the "general rule that the acts of the agent are the acts of a corporation." Frye v. Am. Gen. Fin., Inc., 307 F. Supp. 836, 843 (Miss. 2004) (citations omitted).

As a practical matter, the positions NRMC takes with respect to this claim and its breach of fiduciary claim are difficult to reconcile, but they are not incompatible. First, NRMC claims that Quorum owed fiduciary duties to NRMC, in part, by virtue of its employment of Wesselman and Anderson. For instance, it argues that Quorum is liable for the acts of Wesselman and Anderson under the doctrine of respondeat superior. Billups Petroleum Co. v. Hardin's Bakeries Corp., 63 So. 2d 543, 546 (1953). In order to support its aiding and abetting claim, NRMC argues that Wesselman and Anderson may not have been acting as employees for Quorum inasmuch as the motivations for breaching their fiduciary duties were for their own

---

[12] Quorum does not dispute this Court's holding in Dale v. Alabama Acquisitions, Inc. that the Mississippi Supreme Court would recognize an independent tort for aiding and abetting fraud. 203 F. Supp. 2d 694, 700-01 (S.D. Miss. 2002).

personal profit. See <u>Saucier v. Coldwell Banker JME Realty</u>, 644 F. Supp. 2d 769, 784 (S.D. Miss. 2007). It cites a number of examples in the record where Wesselman and/or Anderson's legal interests may have diverged from those of Quorum. See NRMC's Summ. J. Memo. at 30.

Based on the record before it, the Court finds that granting summary judgment in favor of the Defendants on this issue would be premature. The Defendants moved for summary judgment on this issue based purely on a legal argument, and after considering the cases cited by the Parties, the Court finds NRMC's argument, at least in theory, persuasive. Moreover, NRMC presented the Court with instances, taken from the record, of how Wesselman and Anderson, at some time relevant to the present case, might have acted with interests divergent from Quorum's. But the Court fully recognizes that, in the end, NRMC cannot have it both ways. If the evidence presented at trial shows that Wesselman and Anderson were acting at all times on behalf of Quorum, and therefore that Quorum could be liable for their actions under the doctrine of respondeat superior, then the Court will grant judgment as a matter of law to Quorum on NRMC's aiding and abetting fraud claim.

**6. Whether NRMC Can Recover Its Payments to Quorum Under Mississippi's Version of the Uniform Fraudulent Transfer Act (Count Eight of the Complaint)**

In Count Eight of the Complaint, NRMC attempts to use Mississippi's version of the Uniform Fraudulent Transfer Act (UFTA)

to recover payments made to Quorum pursuant to the Management Agreement. The Defendants counter that NRMC misunderstands and misapplies the UFTA. In an attempt to convey the ridiculousness of NRMC's argument, the Defendants call it the "Coca-Cola Taste Infringement" argument,[13] suggesting that for NRMC to recover as the creditor, ultimately, it would have to sue itself–the debtor. Further, the Defendants argue that even if NRMC could sue itself, it cannot establish any of the fourteen factors necessary to show that the transfers were indeed fraudulent. NRMC attempts to circumvent the traditional debtor-creditor distinction in the statute by claiming that, because it is a Chapter 9 Bankruptcy debtor, it may stand in the shoes of a creditor in order to avoid fraudulent transfers. As NRMC would have it, by virtue of its standing in bankruptcy, it can become a creditor under the UFTA in order to recover from Quorum.

While NRMC's argument is a creative one, the Court finds that it lacks merit. As the Defendants point out in rebuttal, there is no authority for the proposition that 11 U.S.C. § 544(b)(1) is applicable to Miss. Code Ann. § 15-3-1-1, <u>et seq.</u>, and the Court finds that its novel application in this context would be misguided. For instance, even if NRMC could apply the "strong-arm"

---

[13] The reference is to the Coca-Cola Company's widely-distributed commercials in which executives of the Coke brand threaten to sue the purveyors of Coke Zero (Coca-Cola) for "taste infringement." <u>See</u> Stuart Elliot, <u>Can't Tell Your Cokes Apart? Sue Someone</u>, New York Times, Mar. 5, 2007, at C (2007 WLNR 4161486).

provision of the Bankruptcy Code to somehow become a "creditor" for the purposes of Mississippi's UFTA, the Court sees no conceivable way the wording of the UFTA can be construed to make Quorum–the party from which NRMC is attempting to recover–the "debtor." Under NRMC's interpretation of the statute, the Defendants are right about their "taste infringement" argument–for NRMC to recover for transfers incurred "by the debtor," it would have to sue itself. See Miss. Code Ann. § 15-3-107. Accordingly, NRMC's UFTA claim against Quorum will be dismissed with prejudice.

## 7. Whether NRMC Can Recover for the Independent Tort of "Corporate Waste" (Count Nine of the Complaint)

Finally, as to Count Nine of the Complaint, the Defendants argue that Mississippi courts have never recognized the stand-alone tort of corporate waste, and even if they had, NRMC has not alleged facts sufficient to sustain a claim for corporate waste. After reviewing the four cases cited by the Defendants, only two, the Ohio bankruptcy case and the Delaware case, formally recognize the propriety of pleading "corporate waste" as a separate claim. In re Amcast Indus. Corp., 365 B.R. 91 (Bankr. S.D. Ohio 2007); Michelson v. Duncan, 407 A.2d 211 (Del. 1979). Of those two, one court expressly questioned whether a claim for corporate waste can be distinguished from a breach of fiduciary duty claim. In re Amcast Indus. Corp., 365 B.R. at 114 n.15. No court has directly addressed whether a stand-alone tort claim exists under Mississippi law, although a "corporate waste" claim appears to have been pled in one

36

case without success. <u>Worldwide Forest Products, Inc. v. Winston Holding Co.</u>, 1999 WL 33537093, at *18 (N.D. Miss. Jan. 13, 1999). In that case, the district court did not appear to recognize the claim as a stand-alone claim, viewing the phrase "corporate waste" to be subsumed by the plaintiff's breach of duty claim. <u>Worldwide Forest Products, Inc.</u>, 1999 WL 33537093, at *12, *18.[14]

In Delaware, to establish a stand-alone corporate waste claim, "a [p]laintiff must show 'an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade.'" <u>In re Appleseed's Intermediate Holdings, LLC</u>, 470 B.R. 289, (Bankr. D. Del. 2012) (quoting <u>Weiss v. Swanson</u>, 948 A.2d 433, 450 (Del. Ch. 2008)). In other words, a plaintiff must show something more than the vague accusations that the defendants "wasted assets" or were "fiscally irresponsible." <u>See</u> Complaint ¶ 177. In this case, NRMC has failed to argue that the Defendants exchanged corporate assets for a disproportionately small consideration and has also failed to indicate which facts in the record support this claim. The Court chooses not to determine one way or another whether

---

[14] In <u>Worldwide Forest Products</u>, the district court stated, "[the defendant] may be held liable to the shareholders of the corporation *for breach of that duty* and mismanagement of the corporation's business or waste of corporate assets if the proof supports such a claim." <u>Id.</u> at *12 (emphasis added). NRMC's omission of the phrase "breach of duty" in its citation of this sentence indicates the shaky ground about upon which NRMC bases this claim.

Mississippi recognizes a separate "corporate waste" claim, particularly of the variety articulated by the Delaware courts, but dismisses with prejudice the unique "corporate waste" claim espoused by NRMC as found in Count Nine of the Complaint.

### III. Motions in Limine to Exclude Expert Testimony

The Court now turns to the three pending Motions to Exclude [docket entry nos. 93, 94, & 97]. NRMC's Motions to Exclude are routine and will be quickly addressed below; however, the Defendants' Motion to Exclude the testimony of Scott Phillips requires a more detailed analysis. Phillips's testimony is critical to NRMC's ability to sustain certain of its alleged causes of action and also forms the entire basis of its calculation of damages. For this reason, the Court held a daylong Daubert hearing in order to determine whether Phillips qualifies as an expert pursuant to Federal Rule of Civil Procedure 702, and to further inquire into the propriety of his methodology for calculating damages, particularly, how he measured lost profits in this case. At the hearing, the Court expressed its initial conclusion that Phillips would indeed be allowed to testify, and that opinion has not changed.

### 1. Motion to Exclude the Testimony of Scott Phillips

Scott Phillips is the founder, manager, and owner of HMP—the company hired by NRMC to "turn around" the hospital following the termination of its contract with Quorum. Phillips Report at 1.

38

Phillips served as the Chief Restructuring Officer (CRO) of the hospital and was instrumental in NRMC's decision to file for bankruptcy. Phillips acted as NRMC's CRO until March 2009. NRMC filed the present suit against Quorum on December 7, 2009, and HMP ceased daily operations at NRMC in January 2010.[15] Buchanan Depo. at 136. NRMC offers Phillips as its primary expert regarding Quorum's alleged fraudulent accounting practices and the profits lost by NRMC as a result of the Defendants' mismanagement. As to his qualifications, Phillips has a background in accounting, spent thirty-five years in the healthcare industry, and has supervised numerous audits of healthcare providers and payors, including hospitals. Phillips Report at 1-2 & Ex. 23. Furthermore, he has acted as CEO, COO, CFO, and CRO for numerous hospitals and other healthcare companies. Id. Phillips, however, does not hold an active CPA license.

In their Motion to Exclude, the Defendants break down their

---

[15] The Defendants imply that the overlap between Phillips's company and NRMC's law suit renders him unduly prejudiced. In this case Phillips's potential for bias is best addressed during cross-examination. He should not be excluded based on his potential bias. Brawhaw v. Mariner Health Care, Inc., 2008 WL 2004707, at *5 (N.D. Miss. May 8, 2008) ("[T]he court's primary duty in its gate-keeping function is to determine whether the witness is qualified and whether his opinions are relevant and reliable, not whether the witness has a personal bias. . . . [T]he defendants are free to bring out any alleged personal bias during cross examination."); Cruz-Vazquez v. Mennonite Gen. Hosp., Inc., 613 F.3d 54, 59 (1st Cir. 2010) (holding that the district court abused its discretion by excluding expert testimony "due to its own determination that [the expert] would be a biased witness").

objections to Phillips's testimony into three broad categories: (A) his testimony based on his accounting knowledge, (B) his methodology regarding the calculation of damages, and (C) his legal or factual conclusions. "Under Daubert, trial courts act as gate-keepers overseeing the admission of scientific and non-scientific expert testimony." Burleson v. Tex. Dept. of Criminal Justice, 393 F.3d 577, 583 (5th Cir. 2004) (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999)). The analysis to be undertaken in determining an expert's reliability is a flexible one and depends on the facts and circumstances of each case. Kumho, 526 U.S. at 150 (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 594 (1993)). The Court should endeavor to ascertain whether an expert, based on professional or personal experience, applies the same level of "intellectual rigor" characterizing the practice of an expert in the relevant field. Id.

   *A. Knowledge of Accounting*

   Phillips produced a lengthy Rule 26 report wherein he offers his opinion that the hospital was mismanaged under Quorum's leadership and outlines numerous specific instances of mismanagement. In reaching this opinion, he refers to specific errors in the financial statements submitted to the NRMC Board. One such statement is: "Defendants Wesselman and Anderson . . . caused the preparation and distribution . . . of interim and full year financial statements which consistently and materially overstated

the reported value of net patient accounts receivable on the statements of financial condition (balance sheet) of the hospital." Phillips Report at 31. The Defendants object to this and other similar statements because Phillips lacks an active CPA licence and is not certified as a "forensic accountant" as defined by the American Institute of Certified Public Accountants (AICPA).

The Defendants' argument is misguided. <u>Daubert</u> demands reliability, not evidence of certification, and if nothing else, experience indicates that the fact that someone holds a degree or licence does not *ipso facto* indicate that he or she possesses reliable knowledge. <u>See</u> <u>Tuf Racing Prod., Inc. V. American Suzuki Motor Corp.</u>, 223 F.3d 585, 591 (7th Cir. 2000) (calling this notion "radically unsound"). Federal Rule of Civil Procedure 702 does not impose the extra requirement of certification; rather it provides that an expert should have specialized knowledge and anchor his opinion on reliable principles or methods. Thus, the Defendants' discussions of "forensic accounting" and certification by the AICPA have no bearing on the reliability of Phillips's knowledge or methods. What matters to this Court is simply that he has the requisite knowledge and used reliable methods in arriving at his expert opinion.

At the hearing, the Court paid particular attention to Phillip's ability to testify about general accounting practices and concludes that he possesses the professional experience and

41

personal knowledge necessary to render reliable opinions regarding hospital administration and finance, which requires a knowledge of general accounting principles. See Phillips Report at 2. Phillips apprised the Court of his distinguished accounting background and explained how this background supports his expertise in hospital management. For instance, Phillips explained that a hospital CEO is routinely asked to sign off on the hospital's audits, which requires the CEO to aver that the audit was completed in compliance with general accounting principles. Given Phillips's knowledge of and background in accounting, he may render testimony regarding his interpretation of the hospital's finances and balance sheet, including his opinion as to whether NRMC's finance statements comported with generally accepted accounting principles.

   *B. Calculation of Damages*

   The Defendants next argue that the methodology used by Phillips in his damage calculations does not meet the threshold level of reliability required by Daubert. The Mississippi Court of Appeals case Benchmark Health Care Center, Inc. v. Cain provides a succinct overview of the recoverability of lost profits in Mississippi:

> In Mississippi, a party may recover for loss of future profits in a breach of contract action so long as such profits are proved to a reasonable certainty and not based on mere speculation or conjecture. The rule that uncertain damages cannot be recovered applies only to the nature, not the extent, of the damages. If the nature of the damages is certain but the extent is uncertain, recovery is not prevented. In Cain v. Mid-South Pump Co.,

the Mississippi Supreme Court addressed this rule stating:

> [W]here it is reasonably certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery or prevent a jury decision awarding damages. This view has been sustained where, from the nature of the case, extent of the injury and the amount of damage are not capable of exact and accurate proof. Under such circumstances, all that can be required is that the evidence-with such certainty as the nature of the particular case may permit-lay a foundation which will enable the trier of fact to make a fair and reasonable estimate of the amount of damage. The plaintiff will not be denied a substantial recovery if he has produced the best evidence available and it is sufficient to afford a reasonable basis for estimating his loss.

> The supreme court further provided that when a plaintiff has suffered monetary damage and has produced the best evidence available to him, he should not be denied recovery simply because the amount of damages cannot be ascertained with the same precision as an ordinary claim for damages.

912 So. 2d 175 (Miss. App. Ct. 2005) (citations omitted). Therefore, the only rule in Mississippi with regard to demonstrating lost profits is simply that they must be proved with reasonable certainty.

As an initial matter, the present dispute over whether Phillips employed the proper methodology goes to the extent of the damages, not their nature. That is, the Defendants do not appear to challenge that NRMC could have suffered damages in the form of lost profits if NRMC prevails on the merits of one or more of its

43

claims.[16] Instead, the Defendants contest the amount of NRMC's damages, arguing that Phillips' lost-profits valuation is speculative and improper. See, Tillet Report at 26 (estimating a much lower lost-profits damage amount than what Phillips estimates). Thus, the question here is not whether damages for lost profits are proper, but whether the amount of lost profits to which Phillips contends NRMC is entitled is founded on a judicially-recognized methodology.

Turning to Phillips's methodology, no Mississippi case prescribes (or proscribes) a particular method for determining what damages are reasonably certain. Applying Texas law, the Fifth Circuit has stated, however, that there are two basic methods for proving lost profits: (1) the before-and-after approach, and (2) the yardstick approach. See Lehrman v. Gulf Oil Corp., 500 F.2d 659, 668 (5th Cir. 1974). The before-and-after approach compares a business's past profitability with its profitability after the damaging incident, and the yardstick approach compares one business to another similarly-situated business. Mississippi has expressly sanctioned the before-and-after approach, see Warren v. Derivaux, 996 So. 2d 729, 737 (Miss. 2008), but no Mississippi court has recognized the use of the yardstick approach to determine lost profits. The yardstick approach, however, does not appear to be

---

[16] Of course, this conclusion does not discount the Defendants' position that lost profits are consequential damages barred by the limitation of liability clause.

foreclosed by Mississippi law, as the only rule is that damages must be proved with reasonable certainty.

The yardstick approach has been used when a business has no track record. G.M. Brod & Co., Inc. v. U.S. Home Corp., 759 F.2d 1526, 1538 (11th Cir. 1985). In this case, Scott Phillips testified that he did not have reliable records of NRMC's pre-2001 finances and chose to calculate damages by comparing NRMC's profitability with the profitability of another privately-owned, Natchez-based hospital, Natchez Community Hospital.[17] At the hearing, he provided the Court legitimate reasons for doing so. He explained that the hospitals provided the same basic services–although this is factually in dispute–and could have charged the same basic rates for those services. He claimed that NRMC's participation in the Mississippi Public Employee Retirement System (PERS) did not significantly impact the hospital's profitability. He also suggested that the difference between a not-for-profit hospital and a for-profit hospital should not affect the hospital's net income. Finally, he explained why he thought two publically-owned hospitals nearby, King's Daughters Hospital and Mississippi Medical Center,

---

[17] Scott Phillips's report uses two alternative methods to calculate damages: (1) Lost Profit Opportunity Methodology, and (2) Lost Revenue and Excess Cost Methodology. Both methods relied on the yardstick approach, i.e., both models rely on Natchez Community as a so-called "comparable." The Lost Profits Methodology compares the two hospitals' profit margins; the Lost Revenue and Excess Cost Methodology compares revenue on a "per-bed" basis and also accounts for a variety of other factors.

were not suitable for comparison.

After considering Phillips's testimony, the Court sees no reason to discount the yardstick approach because Scott Phillips did not compare Natchez Regional to another similarly-situated *public* hospital. It is difficult to tell whether a different hospital would be a better "comparable," particularly after considering the Rule 26 report of the Defendants' expert witness, J.W. Tillet; however, Scott Phillips will be allowed to explain how NRMC and Natchez Community Hospital are similar and how he accounts for the differences. The appropriate level of damages is an issue to be presented to the finder of fact, and thus, the fact-finder should determine the appropriate yardstick after hearing the testimony of the experts. See, Cummins v. BIC USA, Inc., 2011 WL 2633959, at *6 (W.D. Ky. July 5, 2011) (denying a motion to exclude expert testimony over a dispute about an expert's use of comparable hospitals); Cooper v. Pacific Life Ins. Co., 2007 WL 430693, at *1 (S.D. Ga. Feb. 6, 2007) (denying motion to exclude expert testimony regarding the reasonableness of the costs of variable annuity contracts based on a comparison of the annuities with mutual funds, where the motion was based on an argument that the expert's comparison was not "apples-to-apples"); EEOC v. Morgan Stanley & Co., 324 F. Supp. 2d 451, 468-69 (S.D.N.Y. 2004) (denying motion to exclude expert testimony concerning lost earnings because the expert did not use appropriate comparables).

*C. Legal or Factual Conclusions*

Finally, the Defendants object to "six narrative opinions" which they believe are factually or legally conclusory. For example, the Defendants take issue with Phillips's statement that "Defendants Wesselman and Anderson, during the term of their assignment at the Medical Center, failed at the most fundamental level to provide appropriate and effective executive management and leadership to the Hospital consistent with ordinary professional standards and [Quorum's] management agreement with NRMC." Phillips Report at 5. The Defendants characterize this and other such statements as "analytically-naked," "broadly-brushed," "haphazard," "legally conclusory," "post-hoc" conclusions. If the Defendants disagree with Phillips's conclusions, the proper way for the Defendants to expose his "analytically-naked" methodology is by challenging it with testimony from their own expert witnesses. See Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Phillips possesses sufficient knowledge and experience to render such conclusions and supports his opinions with factual data. Having been recognized as an expert by this Court, he may render his expert opinions, which by their very nature are "post-hoc" conclusions based on prior facts. See Fed. R. Civ. P. 702.

**2. Motion to Exclude the Testimony of J.W. Tillet**

NRMC moves to exclude Defendants' Expert J.W. Tillet on the grounds that (1) he challenges Scott Phillips's qualifications and (2) impermissibly offered testimony regarding a balance sheet entry without admissible evidence to support his testimony. Regarding NRMC's first contention, the Court, having found Scott Phillips qualified to testify as an expert, concludes that Tillet may not testify that Phillips is unqualified to give his opinion. In other words, he cannot state that Phillips's conclusions are flawed because he lacks an active CPA licence, but he can of course explain why he believes Phillips's interpretations of NRMC's finances are flawed, including Phillips's purported failure to apply the standards or guidelines of the AICPA, as long as those references attack the substance of Phillips's testimony.

As to the second issue, at the hearing, the Court briefly addressed Tillet's opinion that Anderson's allegedly fictitious July 2007 $50,000 accounting entry was actually based on a letter from the State of Mississippi regarding the possibility of future payments for the hospital's treatment of Hurricane Katrina victims–a letter that was not produced or authenticated in discovery. The Court informed the Defendants that Tillet will only be allowed to testify about the letter being the basis for the entry if they are able to produce and authenticate the letter. The Defendants responded that they are working on authenticating the

48

letter. Accordingly, the Court will wait until trial to rule on this issue. Tillet will not be allowed to testify that this letter could have been the basis for Anderson's accounting entry *unless* the letter can be produced and properly authenticated at trial.

### 3. Motion to Exclude the Testimony of John Czarnetsky

NRMC's Motion in Limine to Exclude the Testimony of John Czarnetzky can be quickly addressed. Czarnetsky, a professor of bankruptcy at the University of Mississippi School of Law, is prepared to testify about the advantages and disadvantages of filing bankruptcy and whether filing bankruptcy was a viable option for NRMC in 2006. NRMC moves to exclude based on the irrelevancy of Czarnetzky's testimony. See Fed. R. Civ. P. 403. There is some testimony in the record indicating that NRMC's decision not to file bankruptcy in 2006 and the advantages gained by declaring bankruptcy in 2009 will be presented at trial. See Defs.' Memo. in Resp. to Mot. to Exclude at 6-9. The Court anticipates the pros and cons of filing bankruptcy will become less relevant as the Parties begin to present their cases at trial. However, in the event that bankruptcy does become relevant to the presentation of NRMC's or the Defendants' case, it would be error not to allow Czarnetzky to testify on the Defendants' behalf as Czarnetzky is qualified to assist the fact-finder in understanding the evidence. Fed. R. Civ. P. 702(a). Accordingly, this Motion will be deferred until such time as the Court can fully weigh the relevancy of bankruptcy to the

claims or defenses presented at trial.

### IV. Conclusion

Accordingly, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [**docket entry no. 90**] is **GRANTED IN PART AND DENIED IN PART.** Plaintiff's Fraudulent Transfer Act claim (Count Eight) and Corporate Waste claim (Count Nine) are **DISMISSED WITH PREJUDICE. IT IS FURTHER ORDERED** that Defendants' Motion to Exclude [**docket entry no. 93**] is **DENIED. IT IS FURTHER ORDERED** that Plaintiff's Motion to Exclude Portions of J.W. Tillett's Expert Report [**docket entry no. 97**] is **GRANTED IN PART AND DENIED IN PART.** J.W. Tillett will be allowed to testify in accordance with the Court's instruction above. **IT IS FURTHER ORDERED** that Plaintiff's Motion in Limine to Exclude Testimony of Expert Witness John Czarnetzky [**docket entry no. 94**] is **HELD IN ABEYANCE.** The Court will reconsider this Motion at trial.

So **ORDERED,** this the 18th day of July, 2012.


_/s/ David Bramlette_____

**UNITED STATES DISTRICT JUDGE**